## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

UNITED STATES OF AMERICA      :

           vs.            :     CRIMINAL NO. 3:16CR174 (AWT)

MARCUS TYSON           :     April 16, 2020

## MEMORANDUM IN SUPPORT OF MOTION FOR SENTENCE REDUCTION UNDER FIRST STEP ACT (COMPASSIONATE RELEASE)

Marcus Tyson has respectfully moves this Court pursuant to 18 U.S.C. § 3582(c)(1)(A)(i) to reduce his sentence to time served with 151-180 days[1] of home confinement as a condition of supervised release.  As amended by the First Step Act, the compassionate release statute allows courts to reduce sentences for "extraordinary and compelling" reasons.  The growing coronavirus pandemic, which public health experts and policymakers recognize is especially dangerous in the confines of correctional institutions, in combination with Mr. Tyson's asthma, sleep apnea, and nasopharyngeal obstruction that renders him unable to breathe through his nose, is an extraordinary and compelling circumstance.  The Court should grant relief based on Mr. Tyson's respiratory issues and unique susceptibility to contracting the fatal disease while housed in a crowded facility with limited ability to take necessary self-protective measures such as isolating himself and regularly washing or sanitizing his hands.  When the Court sentenced Mr. Tyson, it did not intend its sentence to be a death sentence, but that is the reality that Mr. Tyson now faces in light of the COVID-19 pandemic.

Mr. Tyson respectfully asks the Court to consider this motion on an expedited basis, as each day in custody brings renewed risk to his health and life.

---

[1] *See Exhibit E*, Individualized Release Plan.

# I.  Procedural and Factual Background

On January 24, 2018, the Court sentenced Mr. Tyson to serve sixty months in prison, the applicable mandatory minimum, upon his plea of guilty to 21 U.S.C. §§ 846 and 841(a)(1), (b)(1)(B)(i), Conspiracy to Possess with Intent to Distribute 100 Grams or More of Heroin.  ECF Doc. 186 (Judgment).

Mr. Tyson's Guidelines range, with a criminal history category II and a total offense level of 21, was 41 to 51 months; however, he was subject to the 60 months mandatory minimum.  *See* Presentence Report (PSR) at ¶¶ 30, 39, 80, and 81.

Prior defense counsel, Miles Gerety, in his sentencing memorandum, identified Mr. Tyson's unique family situation with his children, his youngest daughter in particular, as a mitigating factor that could have served as a downward departure/variance basis if the mandatory minimum were not applicable.  Mr. Tyson played a critical role in the day to day lives of his children.  ECF Doc. 177, p. 2-4, PSR at ¶¶ 53-54.  Mr. Tyson's youngest daughter, who is six years old, suffers from Jacobsen Syndrome, a rare genetic disease that causes developmental delays in speech and motor skills and serious cognitive deficits. ECF Doc. 177, p. 2-4. Additionally, she suffers a life-threatening congenital heart defect that has, in the past, required open heart surgery and will require future heart surgeries at regular intervals.  *Id.*  The mortality rate for children with this condition is high.  Twenty percent do not survive past age two.  Most do not survive into adulthood.  *Id.*  When released, Mr. Tyson was instrumental in helping care for all of his children.  *Id.*

After his arrest, Mr. Tyson spent three months at Wyatt, but was then granted release on a non-surety bond with conditions.  He abided by conditions of release and worked toward obtaining his GED before self-surrendering to serve his sentence.

While the PSR reported that Mr. Tyson suffers from asthma and had problems breathing, it incorrectly reports that he never underwent surgery or had been hospitalized.  PSR, ¶ 56.  In fact, in 1994 he had an adenoidectomy and, in addition asthma, he currently reports being generally unable to breathe through his nose and suffers from sleep apnea.  *See* PSR, ¶ 56; *see also* (attached) *Exhibit A*, St. Francis Medical Record; *Exhibit B*, Miles Gerety email correspondence to Warden Edge; *Exhibit C*, Patricia Paulino, NY Federal Defender Office, emails to Miles Gerety and Moira Buckley; *Exhibit D*, BOP Health Services, Medical Duty Status.

Undersigned counsel has tried to obtain additional and more recent medical records for Mr. Tyson, but has encountered numerous roadblocks.  First, she was not original counsel so she had no opportunity to obtain records before his incarceration.  Prior counsel does not have his medical records.  Second, she sent releases to the appropriate parties at Brooklyn, MDC on April 6, 2020.  On Wednesday, April 8, 2020, she had a legal call with Mr. Tyson while he was in his counselor's office.  She asked him if he had been presented with the releases yet.  He had not.  As of yesterday, Mr. Tyson had still not been presented with the releases for his signature.  The only medical record accessible to counsel was that provided by Mr. Tyson's mother (*Exhibit A*).  However, given his chronic history of asthma, his current diagnosis of sleep apnea, and BOP's decision to place him on its "high risk" list, Mr. Tyson has established his increased vulnerability to COVID-19 that is made all the more precarious by his continued incarceration.

Mr. Tyson has been in federal custody in connection with the present offenses since March 28, 2018, with credit for pretrial time (97 days).  While at Fort Devens camp, Mr. Tyson's counselor had submitted paperwork for him to be released to a half-way house on or about April 1, 2020.  In preparation for this, he was transferred to Brooklyn, MDC but has yet to be released.  His early release date is based on his completion of the Residential Drug Abuse Program (RDAP)

and Residential Reentry Center (RRC) placement was recommended for April 1, 2020. *See Exhibit E*, Individualized Release Plan (designating Mr. Tyson release eligible pursuant to 18 USC § 3621).

Bureau of Prisons (BOP) placed Mr. Tyson on a list that included individuals who they designated "high-risk." Undersigned counsel was made aware of this by Mr. Tyson's former counsel, Mr. Gerety, who received correspondence from New York Federal Defender paralegal, Patricia Paulino. Ms. Paulino contacted Mr. Gerety on March 27, 2020 advising him that she had received a list of individuals from BOP who are designated "high risk," meaning, vulnerable to COVID-19 based on the Center for Disease Control's (CDC) criteria. *See Exhibit C*.

On March 30, 2020, on Mr. Tyson's behalf, Mr. Gerety sent an email to Brooklyn, MDC Warden Edge in which he identified (1) Mr. Tyson's respiratory vulnerabilities, and (2) that Mr. Tyson has less than a year left of his sentence and was awaiting placement in a halfway house. Mr. Gerety requested that Warden Edge file a motion for compassionate release on Mr. Tyson's behalf. *See Exhibit B*. On information and belief, Warden Edge has filed no motion and did not respond to Mr. Gerety. *See* U.S. Bureau of Prisons, Program Statement 5050.50, *Compassionate Release Procedures* 3 (Jan. 17, 2019), https://www.bop.gov/policy/progstat/5050_050_EN.pdf ("The Bureau of Prisons processes a request made by another person on behalf of an inmate in the same manner as an inmate's request.")

## II. The Court may reduce Mr. Tyson's sentence pursuant to the First Step Act if extraordinary and compelling reasons warrant reduction.

Under the First Step Act of 2018, federal prisoners may now petition courts directly for reduction of their sentences, and judges may grant such requests if "extraordinary and compelling reasons" warrant a reduction. *See* First Step Act of 2018, Section 603(b), Pub. L. 115-391, 132 Stat. 5194 (2018) (amending 18 U.S.C. § 3582(c)(1)(A)(i)). Previously, courts could modify

sentences under § 3582(c)(1)(A)(i) only upon motion of the U.S. Bureau of Prisons (BOP). Since the First Step Act was enacted, courts have granted relief under § 3582(c)(1)(A)(i) in numerous cases. Here, the Court has the authority to modify Mr. Tyson's sentence because "extraordinary and compelling reasons" are present.

A.    <u>The history of 18 U.S.C. § 3582(c)(1)(A)(i) explains the underpinnings of the authority currently delegated to courts.</u>

Congress first enacted the modern form of the compassionate release statute, codified at 18 U.S.C. § 3582, as part of the Comprehensive Crime Control Act of 1984. Section 3582(c) states that a sentencing court can reduce a sentence whenever "extraordinary and compelling reasons warrant such a reduction." 18 U.S.C. § 3582(c)(1)(A)(i). In 1984, Congress conditioned the reduction of sentences on the BOP Director's filing of an initial motion to the sentencing court. Absent such a motion, sentencing courts had no authority to modify a prisoner's sentence for compassionate release. *Id.*

Although the BOP was first authorized to file compassionate release motions in 1984, the BOP almost never did so. *United States v. Rodriguez*, No. 2:03-CR-271-AB, 2020 WL 1627331, *2 (E.D. Pa. Apr. 1, 2020). From 1984 to 2013, an average of only 24 inmates were released each year through BOP-filed motions. *Id.* (citing *Hearing on Compassionate Release and the Conditions of Supervision Before the U.S. Sentencing Comm'n* (2016) (statement of Michael E. Horowitz, Inspector General, Dep't of Justice)). The BOP's failure was multifaceted; according to a 2013 report by the Inspector General, the BOP's "compassionate release program had been poorly managed and implemented inconsistently, . . . resulting in eligible inmates . . . not being considered for release, and terminally ill inmates dying before their requests were decided." *Id.* (quoting Dep't of Justice, Office of the Inspector General, *The Federal Bureau of Prisons' Compassionate Release Program* (April 2013), at 11, *available at*

https://oig.justice.gov/reports/2013/e1306.pdf). The same report found that the BOP "did not have clear standards as to when compassionate release is warranted and . . . BOP staff therefore had varied and inconsistent understandings of the circumstances that warrant consideration for compassionate release." *Id.*

It was in order to make compassionate release more widely available, and to address the "documented infrequency with which the BOP filed motions for a sentence reduction on behalf of defendants," *see United States v. Redd*, No. 1:97-CR-00006-AJT, 2020 WL 1248493, *7 (E.D. Va. Mar. 16, 2020), that Congress intervened in the compassionate release process by passing the First Step Act, a landmark piece of criminal-justice reform legislation that "amend[ed] numerous portions of the U.S. Code to promote rehabilitation of prisoners and unwind decades of mass incarceration." *Rodriguez*, 2020 WL 1627331, at *2 (quoting *United States v. Brown*, 411 F. Supp.3d 446, 448 (S.D. Iowa) (citing Cong. Research Serv., R45558, *The First Step Act of 2018: An Overview* 1 (2019))).

With the First Step Act, Congress intended to expand the use of compassionate release.[2] The First Step Act amended § 3852(c)(1)(A) to allow prisoners to directly petition courts for compassionate release, removing the BOP's exclusive "gatekeeper" role. Congress made this change in § 603(b) of the First Step Act, titled "Increasing the Use and Transparency of Compassionate Release." Section 603(b) was initially a stand-alone bill that "explicitly sought to 'improve the compassionate release process of the Bureau of Prisons.'" *Id.* (citing *Brown*, 411 F. Supp.3d at 451 (*quoting* Granting Release and Compassion Effectively Act of 2018, S. 2471, 115th Cong. (2018))). Courts have observed that "Section 603(b)'s purpose is enshrined

---

[2] *See* 164 Cong. Rec. S7314-02, 2018 WL 6350790 (Dec. 5, 2018) (statement of Sen. Benjamin L. Cardin, co-sponsor of First Step Act) ("The bill expands compassionate release. . . and expedites compassionate release applications.").

in its title: 'Increasing the Use and Transparency of Compassionate Release.'" *Id; see also United States v. Cantu*, __ F. Supp. 3d __, 2019 WL 2498923, *4 (S.D. Tex. June 17, 2019) ("That title supports the reading that U.S.S.G § 1B1.13 cmt. n.1(D) is not applicable when a defendant requests relief under § 3582(c)(1)(A) as amended because it no longer explains an appropriate use of that statute.").

Although the power to reduce sentences provided for by 18 U.S.C. § 3582(c)(1)(A) has most often been used to reduce the prison terms of terminally ill defendants, "nothing in the statutory language or legislative history of 18 U.S.C. § 3582(c) indicates that Congress intended to limit its application to elderly defendants or defendants with compelling medical circumstances." *See United States v. Millan*, No. 91-CR-685 (LAP), 2020 WL 1674058, *15 (S.D.N.Y. Apr. 6, 2020) (Preska, J.) (granting compassionate release based on defendant's "extraordinary rehabilitation," "remorse and contrition," and "conduct as a model prisoner and man of extraordinary character"). Indeed, the only limitation that Congress has placed on a court's discretionary sentence modification authority is that "[r]ehabilitation of the defendant alone shall not be considered an extraordinary and compelling reason." 28 U.S.C. § 994(t).

Although Congress has never defined what constitutes an "extraordinary and compelling reason" for resentencing under Section 3582(c), the legislative history to the statute gives an indication of how Congress thought the statute should be employed. When first discussing the purposes of the statute in 1983, the Senate Committee stressed how some individual cases, even after the abolition of federal parole, still may warrant a second look at resentencing:

> The Committee believes that there may be unusual cases in which an eventual reduction in the length of a term of imprisonment is justified by changed circumstances. These would include cases of severe illness, *cases in which other extraordinary and compelling circumstances* justify a reduction of an unusually long sentence, and some cases in which the sentencing guidelines for the offense of which the defendant was convicted have been later amended to provide a shorter term of imprisonment.

S. Rep. No. 98-225, at 55–56, 1983 WL 25404 (1983) (emphasis added). Congress intended that the circumstances listed in § 3582(c) would act as "safety valves for modification of sentences," *id.* at 121, enabling judges to provide second looks for possible sentence reductions when justified by various factors that previously could have been addressed through the abolished parole system. This safety-valve statute would "assure the availability of specific review and reduction of a term of imprisonment for 'extraordinary and compelling reasons' and [would allow courts] to respond to changes in the guidelines." *Id.* Noting that this approach would keep "the sentencing power in the judiciary where it belongs," rather than with a federal parole board, the statute permitted "later review of sentences in particularly *compelling situations*." *Id.* (emphasis added).

With the 1984 legislation, Congress directed the Sentencing Commission to promulgate general policy statements regarding the sentencing modification provisions set forth in § 3582(c). *See* 28 U.S.C. § 994(a)(2)(C), (t). Although the Sentencing Commission took decades to do so (waiting from 1984 until 2007), it eventually promulgated U.S.S.G. §1B1.13 to provide guidance in compassionate release cases. The latest version of the Commission's policy statement, adopted in 2016, was intended to broaden eligibility criteria and encourage the BOP Director to file motions when extraordinary and compelling circumstances are present. *See* U.S.S.G. § 1B1.13 & Amendment 799. In a press release by the Sentencing Commission announcing the amendments, the Commission's Chair, Judge Patti Saris, encouraged the BOP "to use its discretion

consistent with [the Sentencing Commission's] new policy so that eligible applications [could be] reviewed by a trial judge."[3]

The Commission's policy statement provides that a sentence reduction for "extraordinary and compelling reasons" must be accompanied by a finding by the court that the person is "not a danger to the safety of any other person or to the community." U.S.S.G. § 1B1.13(2). Reasons supporting a reduction may include the defendant's medical condition, age, or family circumstances, but also "other reasons" that are "extraordinary and compelling." U.S.S.G. § 1B1.13, *cmt.* 1. This final "other reasons" category specifically includes "an extraordinary and compelling reason other than, or in combination with," the other three circumstances listed (*i.e.*, medical condition, age, or family circumstances). The policy does not prohibit consideration of a prisoner's rehabilitation, but provides that "[p]ursuant to 28 U.S.C. § 994(t), rehabilitation of the defendant is not, by itself, an extraordinary and compelling reason for purposes of this policy statement." U.S.S.G. § 1B1.13, *cmt.* 3. In addition, the policy clarifies that "an extraordinary and compelling reason need not have been unforeseen at the time of sentencing in order to warrant a reduction in the term of imprisonment," and thus, "the fact that an extraordinary and compelling reason reasonably could have been known or anticipated by the sentencing court does not preclude consideration for a reduction under this policy statement." *Id.*, *cmt.* 2. Finally, the policy encourages the BOP Director to file motions when extraordinary and compelling circumstances are present and recognizes that the "court is in a unique position to determine whether the circumstances warrant a reduction (and, if so, the amount of reduction), after considering the factors set forth in 18 U.S.C. § 3553(a) and the criteria set forth in this policy

---

[3] Press Release, United States Sentencing Commission, U.S. Sentencing Commission Approves Significant Changes to the Federal Sentencing Guidelines (April 15, 2016), https://www.ussc.gov/about/news/press-releases/april-15-2016.

statement, such as the defendant's medical condition, the defendant's family circumstances, and whether the defendant is a danger to the safety of any other person or to the community." *Id. cmt.* 4.

Although the Commission's policy statement provides that a BOP motion is required for sentence modification, courts have found this provision *inoperable* given that the First Step Act eliminated the requirement of a BOP motion.[4] *See, e.g.*, *United States v. Ebbers*, __ F. Supp. 3d __, 2020 WL 91399, *4 n.6 (S.D.N.Y. Jan. 8, 2020) (Caproni, J.) (observing, "because no statute directs the Court to consult the BOP's rules or guidelines, *see* 28 C.F.R. pt. 571, subpt. G, and no statute delegates authority to the BOP to define the statutory requirements for compassionate release, the Court finds the BOP Guidelines to be inapposite" and citing cases); *United States v. Cantu-Rivera*, No. CR H-89-204, 2019 WL 2578272, *2 n.1 (S.D. Tex. June 24, 2019) ("Because the current version of the Guideline policy statement conflicts with the First Step Act, the newly-enacted statutory provisions must be given effect."); *United States v. Cantu*, __ F. Supp. 3d __, 2019 WL 2498923, *3–4 (S.D. Tex. June 17, 2019) (vesting BOP with authority to determine whether extraordinary and compelling reasons are present "no longer describes an appropriate use of sentence-modification provisions and is thus not part of the applicable policy statement binding the Court").

Indeed, because "the U.S. Sentencing Commission guidance has not yet been updated to reflect the liberalization of the procedural requirements" after Congress passed the First Step Act in 2018, *see United States v. Gagne*, No. 3:18-CR-242 (VLB), 2020 WL 1640152, *2 (D. Conn. Apr. 2, 2020) (Bryant, J), "[t]here is no policy statement applicable to motions for compassionate release filed by defendants under the First Step Act." *United States v. Beck*, __ F. Supp. 3d __,

---

[4] Some courts have referred to this as a "lack" of an applicable policy statement.

2019 WL 2716505, *6 (M.D.N.C. June 28, 2019). Thus, "[w]hile the old policy statement provides helpful guidance, it does not constrain the Court's independent assessment of whether 'extraordinary and compelling reasons' warrant a sentence reduction under § 3582(c)(1)(A)(i)." *Id.*; *see also United States v. Bradshaw*, No. 1:15-CR-422, 2019 WL 7605447, *3 (M.D.N.C. Sept. 12, 2019) (noting that "there is no policy statement applicable to a defendant's motion for compassionate release which constrains the Court's independent assessment of whether 'extraordinary and compelling reasons' warrant a sentence reduction under § 3582(c)(1)(A)(i)"); *United States v. Cantu*, No. 1:05-CR-458-1, 2019 WL 2498923, *4 (S.D. Tex. June 17, 2019) ("Given the changes to the statute, the policy-statement provision that was previously applicable to 18 U.S.C. § 3582(c)(1)(A) no longer fits with the statute and thus does not comply with the congressional mandate that the policy statement must provide guidance on the *appropriate use* of sentence-modification provisions under § 3582.") (emphasis in original); *United States v. Redd*, No. 1:97-CR-00006-AJT, 2020 WL 1248493, *6 (E.D. Va. Mar. 16, 2020) (§ 1B1.13 "by its terms applies only to motions for compassionate release filed by the BOP Director, not motions filed by defendants, and therefore "there does not currently exist, for the purposes of satisfying the First Step Act's 'consistency' requirement, an 'applicable policy statement.'"). Courts must therefore make their own determination about whether extraordinary and compelling reasons warrant a sentence reduction.

The government conceded this point in *United States v. Young*, agreeing that "the dependence on the BOP to determine the existence of an extraordinary and compelling reason, like the requirement for a motion by the BOP Director, is a relic of the prior procedure that is inconsistent with the amendments implemented by the First Step Act." No. 2:00-CR-00002-1, 2020 WL 1047815, *2 (M.D. Tenn. Mar. 4, 2020). Moreover, the Court in *Young* followed the

majority of district courts in recognizing that § 1B1.13's defined categories are not exclusive: "In short, federal judges are no longer constrained by the BOP Director's determination of what constitutes extraordinary and compelling reasons for a sentence reduction." *Id.* at *6.[5]

B.  The Court may reduce Mr. Tyson's term of imprisonment based on its own determination of extraordinary and compelling reasons.

The First Step Act grants sentencing courts authority to reduce an otherwise final term of imprisonment for "extraordinary and compelling reasons." 18 U.S.C. § 3582(c)(1)(A)(i). The statute provides:

> (1) in any case--
>
> > (A) **the court**, upon motion of the Director of the Bureau of Prisons, or upon motion of the defendant after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier, **may reduce the term of imprisonment** (and may impose a term of probation or supervised release with or without conditions that does not exceed the unserved portion of the original term of imprisonment), **after considering the factors set forth in section 3553(a) to the extent that they are applicable, if it finds that**--
> >
> > > (i) **extraordinary and compelling reasons warrant such a reduction**; . . . . . .
> >
> > **and that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission**.

18 U.S.C. § 3582(c)(1)(A)(i). Thus, the statutory requirements for sentence reduction are that the court (1) find extraordinary and compelling reasons for the reduction, (2) consider the relevant

---

[5] *See also, e.g.*, *United States v. Perdiago*, Crim. Action No. 07-103, 2020 WL 1672322, *2 (E.D. La. Apr. 2, 2020); *United States v. Lisi*, No. 15 Cr. 457, 2020 WL 881994, *3 (S.D.N.Y. Feb. 24, 2020) (Failla, J.), *reconsideration denied*, 2020 WL 1331955 (S.D.N.Y. Mar. 23, 2020) (Failla, J.); *United States v. O'Bryan*, No. 96-10076-03-JTM, 2020 WL 869475, *2 (D. Kan. Feb. 21, 2020); *United States v. Maumau*, No. 2:08-CR-00758-TC-11, 2020 WL 806121, *2–3 (D. Utah. Feb. 18, 2020); *United States v. Schmitt*, No. CR12-4076-LTS, 2020 WL 96904, *3 (N.D. Iowa Jan. 8. 2020); *United States v. Rodriguez*, No. 17-CR-00021-WHO-1, 2019 WL 6311388, *7 (N.D. Cal. Nov. 25, 2019); *United States v. Walker*, No. 1:11 CR 270, 2019 WL 5268752, *2 (N.D. Ohio Oct. 17, 2019).

sentencing factors under 18 U.S.C. § 3553(a), and (3) ensure any reduction is consistent with *applicable* policy statements.

When Congress first created compassionate release in 1984, Congress also delegated to the Sentencing Commission authority to "describe what should be considered extraordinary and compelling reasons for sentence reduction, including the criteria to be applied, and a list of specific examples." 28 U.S.C. § 994(t). The Guidelines issued in exercise of that authority, U.S.S.G. § 1B1.13, provides:

> Upon motion of the Director of the Bureau of Prisons under 18 U.S.C. § 3582(c)(1)(A), the court may reduce a term of imprisonment (and may impose a term of supervised release with or without conditions that does not exceed the unserved portion of the original term of imprisonment) if, after considering the factors set forth in 18 U.S.C. § 3553(a), to the extent that they are applicable, the court determines that—
>
> (1)  (A)  extraordinary and compelling reasons warrant the reduction; or
>
> (B)  the defendant (i) is at least 70 years old; and (ii) has served at least 30 years in prison pursuant to a sentence imposed under 18 U.S.C. § 3559(c) for the offense or offenses for which the defendant is imprisoned;
>
> (2)  the defendant is not a danger to the safety of any other person or to the community, as provided in 18 U.S.C. § 3142(g); and
>
> (3)  the reduction is consistent with this policy statement.

The Guideline provides examples of "extraordinary and compelling reasons" only in the application notes. The examples generally fall into four categories based on a defendant's (1) terminal illness; (2) debilitating physical or mental health condition; (3) advanced age and deteriorating health in combination with the amount of time served; or, (4) compelling family circumstances. U.S.S.G. § 1B1.13 *cmt.* 1(A)–(C). The commentary also includes a fifth catch-all provision for "extraordinary and compelling reason other than, or in combination with, the reasons

described in subdivisions (A) through (C)" as determined by the Director of the BOP.  U.S.S.G. § 1B1.13, *cmt.* 1(D).

To summarize, with the changes made to the compassionate release statute by the First Step Act, courts need not await a motion from the Director of BOP to resentence prisoners under 18 U.S.C. § 3582(c)(1)(A)(i) for "extraordinary and compelling reasons."  Moreover, the reasons that can justify resentencing need not involve only terminal illness, disability, or urgent dependent care for minor children.  Instead, courts around the country are finding that "extraordinary and compelling" reasons include the impact of the global pandemic on vulnerable defendants.

## 1. Courts found extraordinary and compelling reasons warranting relief prior to COVID-19.

Since the First Step Act was enacted in December 2018, and prior to the COVID-19 pandemic, courts have found "extraordinary and compelling reasons" under § 3582(c)(1)(A)(i) in circumstances wholly apart from, or in combination with, the limited factors on which the BOP narrowly relied prior to the First Step Act.  *See United States v. O'Bryan*, No. 96-10076-03-JTM, 2020 WL 869475, *2 (D. Kan. Feb. 21, 2020) ("In the wake of the First Step Act, numerous courts have recognized the court can determine whether extraordinary and compelling reasons exist to modify a sentence — and may do so under the 'catch all' provision similar to that recognized in U.S.S.G. Manual § 1B1.13 n.1(D), that is, 'an extraordinary and compelling reason other than, or in combination with, the reasons described in subdivisions (A) through (C)' relating to prisoner health or family relations." (citation and internal quotation marks omitted)).

Written opinions available on Westlaw show that courts are granting relief on a variety of grounds.  Some cases have focused particularly on the medical condition of the petitioner. *See, e.g.*, *United States v. Romero*, No. EP-13-CR-01649-4-FM, 2020 WL 364275, *1, *3 (W.D. Tex. Jan. 21, 2020) (in denying government's motion to reconsider court's finding that

defendant "suffers a serious condition that qualifies as an 'extraordinary and compelling reason' to warrant compassionate release," noting that defendant suffers from "polio, ulcers and hip issues, and a mass in her left shoulder"); *United States v. Ebbers*, __ F. Supp. 3d __, 2020 WL 91399, *8 (S.D.N.Y. Jan. 8, 2020) (concluding that a rapid medical decline, coupled with prisoner's age, present extraordinary and compelling reasons for release); *United States v. Schmitt*, No. CR12-4076-LTS, 2020 WL 96904, *4 (N.D. Iowa. Jan. 8, 2020) (granting relief to a prisoner "suffering from a terminal illness, stage four metastatic breast cancer that is spreading to other parts of her body"); *United States v. Larry*, No. 1:16-CR-0069 LJO, 2019 WL 4834850, *1 (E.D. Cal. Oct. 1, 2019) (finding "extraordinary and compelling reasons" warranting relief under the First Step Act because the petitioner is "suffering from serious chronic medical conditions" which have "diminish[ed] his ability to provide self-care within the environment of a correctional facility"); *United States v. Bradshaw*, No. 2:05-CR-17-01, 2019 WL 7605447, *1, *3 (M.D.N.C. Sept. 12, 2019) (finding the petitioner's diagnosis of "stage IV metastatic prostate cancer that ha[s] spread to his bones" qualifies as "extraordinary and compelling reasons" warranting relief pursuant to the First Step Act, noting that petitioner "has served approximately 37 months of his 72-month sentence" and "[t]here is nothing in the record to indicate that he has had any disciplinary violations or infractions while in BOP's custody"); *United States v. York*, Nos. 3:11-CR-76 3:12-CR-145, 2019 WL 3241166, *6 (E.D. Tenn. July 18, 2019) (finding prisoner's "combination of medical conditions, but particularly his heart condition, to be extraordinary or compelling reasons justifying a sentence reduction").

Courts have also stressed the BOP's failure to provide adequate medical care in concluding that extraordinary and compelling circumstances warrant relief. *See, e.g.*, *United States v. Beck*, No. 1:13-CR-186-6, 2019 WL 2716505, *13 (M.D.N.C. June 28, 2019) (concluding that

"[i]nvasive cancer and the abysmal health care provided by BOP qualify as extraordinary and compelling reasons warranting a reduction in her sentence to time served").

In granting relief, courts have also considered changes in sentencing policy since the defendant was originally sentenced. *See, e.g.*, *United States v. Decator*, Crim. No. CCB-95-0202, 2020 WL 1676219, *5 (D. Md. Apr. 6, 2020) (granting compassionate release based on the § 3553(a) factors and "the 'extraordinary and compelling' fact that most of Decator's lengthy sentence resulted from the now-eliminated practice of 'stacking' § 924(c) sentences"); *United States v. O'Bryan*, No. 96-10076-03-JTM, 2020 WL 869475, *2 (D. Kan. Feb. 21, 2020) (granting motion to reconsider order denying motion for compassionate release based on the First Step Act's modification of sentencing for offenses under 18 U.S.C. § 924(c)); *United States v. Maumau*, No. 2:08-CR-758-TC, 2020 WL 806121, *7 (D. Utah Feb. 12, 2020) ("Based on the above, the court concludes that a combination of factors—Mr. Maumau's young age at the time of the sentence, the incredible length of the mandatory sentence imposed, and the fact that, if sentenced today, he would not be subject to such a long term of imprisonment—establish an extraordinary and compelling reason to reduce Mr. Maumau's sentence."); *United States v. Urkevich*, No. 8:03CR37, 2019 WL 6037391, *4 (D. Neb. Nov. 14, 2019) (in granting compassionate release motion, holding that reduction "is warranted by extraordinary and compelling reasons, specifically the injustice of facing a term of incarceration forty years longer than Congress now deems warranted for the crimes committed"); *United States v. Cantu-Rivera*, Cr. No. H-89-204, 2019 WL 2578272, *4 (S.D. Tex. June 24, 2019) (granting relief to petitioner serving life sentence based on "fundamental change to sentencing policy carried out in the First Step Act's elimination of life imprisonment as a mandatory sentence solely by reason of a

defendant's prior convictions" in combination with other factors including the petitioner's "extraordinary degree of rehabilitation, age, and medical condition").

In addition, courts have considered a combination of factors including rehabilitation, acceptance of responsibility, and the petitioner's ability to care for his family and help society outside of prison. *See, e.g.*, *United States v. Millan*, No. 91-CR-685 (LAP), 2020 WL 1674058, *15 (S.D.N.Y. Apr. 6, 2020) (Preska, J.) ("Mr. Millan's extraordinary rehabilitation, together with his remorse and contrition, his conduct as model prisoner and man of extraordinary character, his leadership in the religious community at FCI Fairton, his dedication to work with at-risk youth and suicide prevention, and the support of BOP staff at FCI Fairton, including their opinion that if released, Mr. Millan would be a productive member of society and no danger to others, and the sentencing disparity that would result from further incarceration all constitute extraordinary and compelling reasons justifying a reduction in sentence."); *United States v. Reyes*, No. 04 CR 970, 2020 WL 1663129, *5 (N.D. Ill. Apr. 3, 2020) ("The Court founds that [defendant] has demonstrated family circumstances and rehabilitation that allow for a sentence reduction based on extraordinary and compelling circumstances; because[defendant] has served most of his sentence already, the Court finds that these circumstances allow an early release."); *United States v. Redd*, No. 1:97-CR-00006-AJT, 2020 WL 1248493, a*6 (E.D. Va. Mar. 16, 2020) (granting compassionate release motion based on extraordinary and compelling circumstances with respect to defendant's "excessive term of imprisonment and his extensive rehabilitation when incarcerated"); *United States v. Perez*, No. 88-10094-1-JTM, 2020 WL 1180719 (D. Kan. Mar. 11, 2020) (defendant has presented "extraordinary and compelling reasons" where he has served more than 30 years in prison on his convictions, and during that time has had only two minor infractions with the BOP. He gained his GED while in prison and has availed himself of

various educational programs."); *United States v. Walker*, No. 1:11 CR 270, 2019 WL 5268752, *2 (N.D. Ohio Oct. 17, 2019) (concluding that the petitioner's "history; the circumstances leading up to his crime; his acceptance of responsibility not just with regard to the conviction but as demonstrated through the meaningful use of his time in prison; the failing health of his mother; his extraordinary job opportunity and the good that would allow him to do for his family and his community; and, the minimum time left remaining on his sentence" qualify as "extraordinary and compelling reasons" warranting relief pursuant to the First Step Act); *United States v. Bucci*, 409 F. Supp. 3d 1, 2–3 (D. Mass. 2019) (concluding that the petitioner's "role as the only potential caregiver for his ailing mother" coupled with the existence of the petitioner's "rehabilitation through his substantial time in prison" which has included "devoting much of his time to care for terminally ill inmates" qualify as "extraordinary and compelling reasons" warranting relief pursuant to the First Step Act).

### 2. Courts have found extraordinary and compelling reasons warranting relief in the wake of the COVID-19 pandemic.

Since the COVID-19 pandemic, numerous courts in this Circuit have found extraordinary and compelling reasons warranting relief where a defendant presents evidence of a pre-existing condition making him more vulnerable to COVID-19 in combination with the increased risks of COVID-19 in prisons. *See, e.g.*, *United States v. McCarthy*, Nos. 3:17-CR-230 (JCH), 3:92-CR-70 (JCH), 2020 WL 1698732, *5 (D. Conn. Apr. 8, 2020) (Hall, J.) ("The defendant's age and medical condition, taken in concert with the COVID-19 public health crisis, constitute an extraordinary and compelling reason to reduce McCarthy's sentence."); *United States v. Hansen*, 07-CR-520 (KAM), 2020 WL 1703672, *8 (E.D.N.Y. Apr. 8., 2020) (Matsumoto, J.) (recognizing "the unique risks posed by the COVID-19 pandemic to prisoners like [the defendant]" in granting compassionate release for "elderly and infirm" inmate suffering from diabetes); *United States*

*v. Zukerman*, No. 16 Cr. 194 (AT), 2020 WL 1659880, *2–*3 (S.D.N.Y. Apr. 3, 2020) (Torres, J.) (granting compassionate release for 75-year-old defendant with diabetes, hypertension, and obesity); *United States v. Colvin*, No. 3:19-CR-179, 2020 WL 1613943, *4 (D. Conn. Apr. 2, 2020) (Arterton, J.) (finding "extraordinary and compelling reasons justifying . . . immediate release under Section 3582(c)(1)(A) and U.S.S.G. 1B1.13" where defendant has "diabetes, a serious medical condition which substantially increases her risk of severe illness if she contracts COVID-19" (internal quotation marks, citation, and alteration omitted)); *United States v. Resnick*, No. 14 CR 810 (CM), 2020 WL 1651508, *7 (S.D.N.Y. Apr. 2, 2020) (McMahon, J.) (granting compassionate release where defendant suffers from "diabetes and end-stage liver disease" based on "(1) the highly infectious nature of COVID-19, (2) the limitations in a prison environment (even a prison medical center) on practicing the hygienic and social distancing techniques that the Center for Disease Control has put in place to prevent rapid transmission, and (3) the fact that [defendant] suffers from ailments that have already been identified as "high risk"); *United States v. Hernandez*, __ F. Supp. 3d __, 2020 WL 1684062, *3 (S.D.N.Y. Apr. 2, 2020) (Engelmayer, J.) (finding "extraordinary and compelling" circumstances because "COVID-19 presents a heightened risk for incarcerated defendants like [the 23-year-old defendant] with respiratory ailments such as asthma" ); *United States v. Jepsen*, No. 3:19-CV-73 (VLB), 2020 WL 1640232, *5 (D. Conn. Apr. 1, 2020) (Bryant, J.) (granting compassionate release where defendant "is immunocompromised and suffers from multiple chronic conditions that are in flux and predispose him to potentially lethal complications if he contracts COVID-19"); *United States v. Perez*, __ F. Supp. 3d __, 2020 WL 1546422, *4 (S.D.N.Y. Apr. 1, 2020) (Torres, J.) finding "extraordinary and compelling reasons" based on defendant's "medical condition, combined with the limited time remaining on his prison sentence and the high risk in the MDC posed by COVID-

19"); Order, *United States v. Marin*, No. 1:15-CR-252-PKC-RML, ECF No. 1326 (E.D.N.Y. Mar. 30, 2020) (Chen, J.) (granting compassionate release motion based on defendant's "advanced age, significantly deteriorating health, elevated risk of dire health consequences due to the current COVID-19 outbreak, status as a non-violent offender, and service of 80% of his original sentence."); *United States v. Campagna*, No. 16 Cr. 78-01 (LGS), 2020 WL 1489829, *3 (S.D.N.Y. Mar. 27, 2020) (Schofield, J.) ("Defendant's compromised immune system, taken in concert with the COVID-19 public health crisis, constitutes an extraordinary and compelling reason to modify to Defendant's sentence[.]"); see also *United States v. Brito*, No. 3:18-CR-81 (SRU), ECF No. 1030 (D. Conn. Apr. 6, 2020) (Underhill, J.) (granting compassionate release for defendant with diabetes and asthma on consent).

These decisions granting compassionate release based on vulnerability to COVID-19 are by no means limited to the Second Circuit. *See, e.g.*, Memorandum and Order at 10, *United States v. Foster*, No. 1:14-CR-324-JEJ, ECF No. 191 (M.D. Pa. Apr. 3, 2020) (noting the "unprecedented" circumstances facing "our prison system" and finding that COVID-19 is an extraordinary and compelling basis for release; indeed, "[n]o rationale is more compelling or extraordinary"); *United States v. Edwards*, No. 6:17-CR-3, 2020 WL 1650406, *6 (W.D. Va. Apr. 2, 2020) (granting compassionate release; "[h]ad the Court known when it sentenced Defendant in 2018 that the final 18 months of his term in federal prison would expose him to a heightened and substantial risk presented by the COVID-19 pandemic on account of Defendant's compromised immune system, the Court would not have sentenced him to the latter 18 months"); Order, *United States v. Hernandez*, No. 18-CR-20474, ECF No. 41 (S.D. Fla. Apr. 2, 2020) (granting unopposed motion for compassionate release for defendant with cancer and immunosuppression and just under 12 months left to serve on 39 month sentence); *United States*

*v. Perdiago*, Crim. Action No. 07-103, 2020 WL 1672322, *1, *4 (E.D. La. Apr. 2, 2020) (granting compassionate release based on "a serious and debilitating heart condition" after accelerating briefing schedule based on "the fear that the virus could promptly and critically threaten [defendant's] health and wellbeing while incarcerated"); *United States v. Rodriguez*, No. 2:03-CR-271-AB, 2020 WL 1627331, *2 (E.D. Pa. Apr. 1, 2020) (granting release because for a diabetic inmate, "nothing could be more extraordinary and compelling than this pandemic" and noting that prisons are "tinderboxes for infectious disease"); Order at 7, *United States v. Williams*, No. 3:04-cr-95-MCR-CJK, ECF No. 91 (N.D. Fla. Apr. 1, 2020) (granting compassionate release where defendant's "cardiovascular and renal conditions compromise his immune system, which, taken with his advanced age, put him at significant risk for even more severe and life threatening illness should he be exposed to COVID-19 while incarcerated"); *United States v. Gonzalez*, No. 2:18-CR-232-TOR, 2020 WL 1536155, *3 (E.D. Wash. Mar. 31, 2020) (releasing defendant with COPD and emphysema one month into a 10-month sentence; ordinarily these conditions would be manageable but "these are not normal times"); *United States v. Muniz*, No. 4:09-CR-199, 2020 WL 1540325, *1 (S.D. Tex. Mar. 30, 2020) (releasing defendant serving 188-month sentence for drug conspiracy in light of vulnerability to COVID-19: "[W]hile the Court is aware of the measures taken by the Federal Bureau of Prisons, news reports of the virus's spread in detention centers within the United States and beyond our borders in China and Iran demonstrate that individuals housed within our prison systems nonetheless remain particularly vulnerable to infection."); Amended Order, *United States v. Powell*, No. 1:94-CR-316-ESH, ECF No. 98 (D.D.C. Mar. 28, 2020) (granting unopposed motion for compassionate release of 55-year-old defendant with sleep apnea and asthma in light of COVID-19); *see also* Memorandum Opinion and Order Granting Motion for Sentence Reduction at 9, *United States v. Hakim*,

No. 4:05-CR-40025-LLP, ECF No. 158 (D.S.D. Apr. 6, 2020) (reducing life sentence by an extra 40 months under Section 404 of the First Step Act in the light of the extreme danger posed by COVID-19; "under the facts of the case including [defendant's] fragile health which makes him especially vulnerable to COVID-19, that should be considered once 404 relief is otherwise warranted"); Order, *United States v. Copeland*, No. 2:05-CR-135-DCN, ECF No. 662 (D.S.C. Mar. 24, 2020) (reducing life sentence to time served under Section 404 of the First Step Act in part due to "Congress's desire for courts to release individuals the age defendant is, with the ailments that defendant has during this current pandemic").

Accordingly, this Court has authority to consider whether the worsening global pandemic, combined with the other relevant circumstances in this case, including Mr. Tyson's asthma, nasopharyngeal obstruction, and sleep apnea, present an extraordinary and compelling basis for a sentence reduction, regardless of whether BOP moves for compassionate release or whether the request falls within one of the existing categories in the commentary to U.S.S.G. § 1B1.13.

III.    **Mr. Tyson's vulnerability to COVID-19 is an extraordinary and compelling reason for a reduction in sentence to time served.**

Black's Law Dictionary defines "extraordinary" as "[b]eyond what is usual, customary, regular, or common."  *Extraordinary*, BLACK'S LAW DICTIONARY 730 (11th ed. 2019).   Its definition of "compelling need," is one "so great that irreparable harm or injustice would result if it is not met."  *Compelling Need*, BLACK'S LAW DICTIONARY 352 (11th ed. 2019).  The present global pandemic is a quintessential extraordinary circumstance beyond what most Americans have experienced in their lifetimes.  The grave risk to Mr. Tyson from continued incarceration provides a compelling reason for his immediate release.

A.  COVID-19 is an unprecedented and rapidly-expanding global health emergency that is spreading in prisons, which in combination with Mr. Tyson's condition, make him particularly susceptible to sickness and increased risk of death.

In recent months, COVID-19 has spread across the globe and throughout the United States. As of April 16, 2020, COVID-19 has sickened over two million people, leading to at least 136,442 deaths worldwide.[6]  The United States has become the epicenter of the crisis, with 638,374 cases and 28,628 deaths thus far.[7]  The numbers, which increase sharply every day, almost certainly underrepresent the true scope of the crisis in the United States considering the widespread unavailability of test kits to detect the virus.

On March 11, 2020, the World Health Organization officially classified COVID-19 as a pandemic.[8]  On March 13, 2020, the President of the United States declared the COVID-19 outbreak a national emergency under the National Emergencies Act, 50 U.S.C. §§ 1601 *et seq,*[9] and his administration states that even if all precautions are followed, there is an estimated death toll in the United States of 100,000 to 240,000 people.[10]

The CDC advises that the coronavirus is "spread mainly from person-to-person . . . [b]etween people who are in close contact with one another . . . [t]hrough respiratory droplets

---

[6]  *Coronavirus Map: Tracking the Global Outbreak*, N.Y. TIMES (updated daily), https://www.nytimes.com/interactive/2020/world/coronavirus-maps.html (last visited Apr. 16, 2020).

[7]  *Coronavirus in the U.S.:  Latest Map and Case Count*, N.Y. TIMES (updated daily), https://www.nytimes.com/interactive/2020/us/coronavirus-us-cases.html (last visited Apr. 16, 2020).

[8]  Press Release, World Health Organization, WHO Director-General's opening remarks at the media briefing on COVD-19 – 11 March 2020, (March 11, 2020), *available at* https://www.who.int/dg/speeches/detail/who-director-general-s-opening-remarks-at-the-media-briefing-on-covid-19---11-march-2020.

[9]  The White House, Proclamation on Declaring a National Emergency Concerning the Novel Coronavirus Disease (COVID-19) Outbreak (March 13, 2020), *available at* https://www.whitehouse.gov/presidential-actions/proclemation-declaring-national-emergency-concerning-novel-coronavirus-disease-covid-19-outbreak/.

[10] White House Task Force Projects 100,000 to 240,000 Deaths Within U.S., Even with Mitigation, https://www.washingtonpost.com/world/2020/03/31/coronavirus-latest-news/.

produced when an infected person coughs or sneezes."[11]  The droplets can land in the mouths or

noses, or can be inhaled into the lungs, of people who are within about six feet of the infected

person.[12]  The coronavirus is highly contagious and those who are infected can spread the virus

even if they are asymptomatic.[13]  Additionally, studies have shown that the coronavirus can survive

from three hours to three days on various surfaces.[14]  At this time, there is no known treatment,

vaccine, or cure for COVID-19.[15]

COVID-19 cases have already been confirmed at multiple BOP facilities, and with every

day that passes, BOP identifies additional cases at additional institutions.[16]  As of April 15, 2020,

BOP has identified 449 inmate cases and 280 staff cases.[17]  As of April 15, 2020, 16 inmates have

died in BOP custody.[18]  As the court noted in *United States v. Caddo*, "it is unknowable whether

BOP detainees or inmates have Covid-19 until they are tested, and BOP has not conducted many

or any such tests because, like the rest of the country, BOP has very few or no actual Covid-19 test

packets."  Order at 5, *United States v. Caddo*, No. 3:18-cr-08341-JJT, ECF No. 174 (D. Ariz.

Mar. 23, 2020).

---

[11] CDC, Coronavirus Disease 2019 (COVID-19), How It Spreads, March 4, 2020, https://www.cdc.gov/coronavirus/2019-ncov/prepare/transmission.html.

[12] *Id.*

[13] Marco Cascella, *et al.*, Features, Evaluation and Treatment Coronavirus (COVID-19), National Center for Biotechnology Information ("NCBI"), March 20, 2020, https://www.ncbi.nlm.nih.gov/books/NBK554776/#_ncbi_dlg_citbx_NBK554776.

[14] National Institute of Allergy and Infectious Diseases, New coronavirus stable for hours on surfaces, March 17, 2020, https://www.nih.gov/news-events/news-releases/new-coronavirus-stable-hours-surfaces ("[S]cientists [from the National Institutes of Health, CDC, UCLA and Princeton University] found that [coronavirus] was detectable in aerosols for up to three hours, up to four hours on copper, up to 24 hours on cardboard and up to two to three days on plastic and stainless steel.").

[15] CDC, Coronavirus Fact Sheet, March 20, 2020, https://www.cdc.gov/coronavirus/2019-ncov/downloads/2019-ncov-factsheet.pdf.

[16] U.S. Bureau of Prisons, COVID-19 Coronavirus (updated daily), https://www.bop.gov/coronavirus/ (last visited Apr. 15, 2020).

[17] *Id.*

[18] *Id.*

Because transmission may happen asymptomatically, BOP is quarantining inmates even in institutions where there are no positive cases. The CDC now warns that as many as 25 percent of people infected with the virus have no symptoms, would not be tested for the virus, and may be "unwitting spreaders."[19] Dr. Jeffrey Shaman, an infectious disease expert at Columbia University, explains: "The bottom line is that there are people out there shedding the virus who don't know that they're infected."[20]

Alarmingly, the Marshall Project recently reported that staff at the BOP facility at Oakdale were told to report to work, even if they had exposure to individuals who tested positive for COVID-19, as long as they were not symptomatic.[21] Prior to March 13, 2020, when the BOP suspended visits for 30 days, inmates regularly engaged in social, legal and medical visits with people in the community at a time when the novel coronavirus already began to spread.[22] To this day, inmates must share communal living spaces, such as cells, recreation rooms, dining halls, libraries, and exercise yards. To make matters worse, hand sanitizer, an effective disinfectant recommended by the CDC to reduce transmission, is deemed forbidden "contraband" in BOP facilities because of its alcohol content.[23]

---

[19] Apoorva Mandavilli, *Infected but Feeling Fine: The Unwitting Coronavirus Spreaders*, N.Y. TIMES (April 1, 2020), *available at* https://www.nytimes.com/2020/03/31/health/coronavirus-asymptomatic-transmission.html?action=click&module=Top%20Stories&pgtype=Homepage.

[20] *Id.*

[21] Joseph Neff & Keri Blakinger, *Federal Prison Agency "Put Staff in Harm's Way" of Coronavirus: Orders at Oakdale in Louisiana Help Explain COVID-19 Spread*, MARSHALL PROJECT, Apr. 3, 2020, 6:14 PM, https://www.themarshallproject.org/2020/04/03/federal-prisons-agency-put-staff-in-harm-s-way-of-coronavirus.

[22] U.S. Bureau of Prisons, Federal Bureau of Prisons Covid-19 Action Plan (Mar. 13, 2020, 3:09 PM), https://www.bop.gov/resources/news/20200313_covid-19.jsp.

[23] Keri Blakinger and Beth Schwarzapfel, *How Can Prisons Contain Coronavirus When Purell is Contraband?,* ABA J. (March 13, 2020), available at *https://www.abajournal.com/news/article/when-purell-is-contraband-how-can-prisons-contain-coronavirus.*

Recognizing the unique risks that correctional facilities pose to both inmates and employees, members of Congress asked the BOP on March 19, 2020, to allow for the immediate release of elderly, non-violent inmates.[24] The following week, Attorney General Barr urged the Director of the BOP to prioritize home confinement for such vulnerable individuals.[25] On March 27, 2020, more than 400 former DOJ leaders, attorneys, and federal judges sent an open letter to the President, asking that he take immediate action to reduce the population in correctional facilities to prevent the catastrophic spread of COVID-19, in particular by commuting the sentences of elderly and medically vulnerable inmates who have already served a majority of their sentence.[26] The same day, dozens of leading public health experts made a similar request, asking the President to commute the sentences of all elderly inmates, noting that these individuals are at the highest risk of dying from the disease and pose the smallest risks to public safety.[27] On March 30, 2020, Congress wrote Attorney General Barr again to implore him "to do the right thing" and "immediately move to release medically-compromised, elderly, and pregnant prisoners in the custody of the BOP."[28]

---

[24] Letter from Rep. Jerrold Nadler & Rep. Karen Bass to U.S. Attorney General William P. Barr (Mar. 19, 2020), *available at* https://judiciary.house.gov/uploadedfiles/2020-03-19_letter_to_ag_barr_re_covid19.pdf ("DOJ and BOP must also do all they can to release as many people as possible who are currently behind bars and at risk of getting sick. Pursuant to 18 U.S.C. 3582(c)(1)(A), the Director of the Bureau of Prisons may move the court to reduce an inmate's term of imprisonment for "extraordinary and compelling reasons.").

[25] Memorandum from Attorney General William P. Barr to Director of Bureau of Prisons (Mar. 26, 2020), available at https://www.justice.gov/file/1262731/download.

[26] Letter from Julie Abbate, et al. to President Donald J. Trump (Mar. 27, 2020), *available at* https://fairandjustprosecution.org/wp-content/uploads/2020/03/Letter-to-Trump-from-DOJ-and-Judges-FINAL.pdf.

[27] Letter from Sandro Galea, et al. to President Donald J. Trump (Mar. 27, 2020), *available at https://thejusticecollaborative.com/wp-content/uploads/2020/03/Public-Health-Expert-Letter-to-Trump.pdf.*

[28] Letter from Rep. Jerrold Nadler & Rep. Karen Bass to U.S. Attorney General William P. Barr (Mar. 30, 2020), *available at* https://judiciary.house.gov/uploadedfiles/3.30.20_letter_to_ag_barr_re_covid19.pdf.

Jails and prisons are among the most dangerous places to be during an epidemic because they create the ideal environment for transmission of contagious diseases.[29] The attached expert declaration of Dr. Jaime Meyer explains the particular risks of contagious diseases in prison. *Exhibit F* (expert declaration of Dr. Jaime Meyer, Yale Law School Liman Center Affiliate, filed in numerous cases). Inmates are confined in close proximity and the staff leave and return daily. Incarcerated individuals "are at special risk of infection, given their living situations," and "may also be less able to participate in proactive measures to keep themselves safe;" "infection control is challenging in these settings," according to public health experts.[30] Jails and prisons are sites of disproportionate infectious disease rates.[31] Outbreaks of the flu regularly occur in jails, and during the H1N1 epidemic in 2009, many jails and prisons dealt with high numbers of cases.[32]

In China, officials have confirmed the coronavirus spreading rapidly in Chinese prisons.[33] Secretary of State Mike Pompeo has called for Iran to release Americans detained there because of the "deeply troubling" "[r]eports that COVID-19 has spread to Iranian prisons," noting that "[t]heir detention amid increasingly deteriorating conditions defies basic human decency."[34] Courts across Iran have granted 54,000inmates furlough as part of the measures to contain

---

[29] Joseph A. Bick, *Infection Control in Jails and Prisons*, 45 Clinical Infectious Diseases 8, 1047–55 (Oct. 15, 2007), *available at* https://doi.org/10.1086/521910.

[30] "Achieving A Fair And Effective COVID-19 Response: An Open Letter to Vice-President Mike Pence, and Other Federal, State, and Local Leaders from Public Health and Legal Experts in the United States," (March 2, 2020), *available at* https://bit.ly/2W9V6oS.

[31] Leonard S. Rubenstein, *et al.*, *HIV, Prisoners, and Human Rights*, Lancet (July 14, 2016), https://www.thelancet.com/journals/lancet/article/PIIS0140-6736(16)30663-8/fulltext.

[32] *Prisons and Jails are Vulnerable to COVID-19 Outbreaks*, The Verge (Mar. 7, 2020), https://bit.ly/2TNcNZY.

[33] Rhea Mahbubani, *Chinese Jails Have Become Hotbeds of Coronavirus As More Than 500 Cases Have Erupted, Prompting the Ouster of Several Officials*, Bus. Insider (Feb. 21, 2020, 5:11 PM), https://www.businessinsider.com/500-coronavirus-cases-reported-in-jails-in-china-2020-2.

[34] Jennifer Hansler & Kylie Atwood, *Pompeo calls for humanitarian release of wrongfully detained Americans in Iran amid coronavirus outbreak,* CNN (Mar. 10, 2020), https://www.cnn.com/2020/03/10/politics/mike-pompeo-iran-release-detained-americans-coronavirus/index.html.

coronavirus across the country.[35]  It was reported on March 18 that a guard at Rikers Island in New

York City had tested positive for COVID-19.[36]  Three days later, at least 38 people at Rikers had

tested positive.[37]  Despite efforts to release hundreds of detainees to try to stem the tide of infection

there,[38] the virus continues to spread rapidly; as of April 7, 2020, 287 inmates and 406 staffers  had

tested positive, and seven Department of Corrections staff members and one inmate have died.[39]

Hundreds of detainees have been released in other jurisdictions, including 600 in Los Angeles and

300 in San Francisco.[40]

The large-scale release of detainees reflects the growing recognition that "[i]t's like an

approaching tsunami.  Once it hits, it's too late. . . .  We should release as many as it's safe to

release in order to avoid a situation like the one at Rikers."[41]  "The coronavirus is invading

U.S. jails and prisons, prompting inmate releases, reduced bail requirements and other

extraordinary measures as officials rush to avert a potentially disastrous spread of the virus among

crowded inmate populations."[42]  As a prominent group of Yale School of Medicine "medical

[35] Claudia Lauer and Colleen Long, *US Prisons, Jails On Alert for Spread of Coronavirus*, ASSOCIATED PRESS (Mar. 7, 2020, 8:12 PM), https://apnews.com/af98b0a38aaabedbcb059092db356697.

[36] *NYC Officials Call for Release of 'Most at Risk' on Rikers Island as More Test Positive for Virus*, NBC N.Y., ASSOCIATED PRESS (Mar. 18, 2020), https://www.nbcnewyork.com/news/local/nyc-officials-call-for-release-of-most-at-risk-on-rikers-prison-as-more-test-positive-for-virus/2333348.

[37] *38 Positive for Coronavirus at Rikers, NYC Jails*, N.Y. TIMES, ASSOCIATED PRESS (March 21, 2020), https://www.nytimes.com/aponline/2020/03/21/us/ap-us-virus-outbreak-inmates.html.

[38] Craig McCarthy, *NYC To Release 300 More Rikers Inmates Admit Coronavirus Pandemic*, N.Y. POST (Mar. 25, 2020 7:25 AM), https://nypost.com/2020/03/25/nyc-to-release-300-more-rikers-inmates-amid-coronavirus-pandemic/.

[39] *914 Dead in N.Y.C., and City's Virus Case Count Tops 38,000*, N.Y. TIMES (Mar. 31, 2020, 7:31 a.m. ET), https://www.nytimes.com/2020/03/30/nyregion/coronavirus-new-york-update.html.

[40] Justin Carissimo, *First Rikers Island Inmate Dies After Testing Positive for Coronavirus*, CBS NEWS (Apr. 7, 2020 2:36 PM), https://www.cbsnews.com/news/coronavirus-michael-tyson-rikers-island-inmate-dies-covid-19/.

[41] *38 Positive for Coronavirus at Rikers*, *supra*.

[42] *Releasing Inmates, Screening Staff: U.S. Jails and Prisons Rush to Limit Virus Risks*, N.Y. TIMES, REUTERS (March 22, 2020), https://www.nytimes.com/reuters/2020/03/22/us/22reuters-health-coronavirus-usa-inmates.html (emphasis added).

professionals and experts in infectious disease and/or prison populations" recently wrote to Connecticut Supreme Court Associate Justice Andrew J. McDonald, the way to safeguard inmates is to reduce jail populations now.[43] "Once a case of COVID-19 [is] identified in a facility, it will likely be too late to prevent a widespread outbreak."[44] Two doctors who are contracted experts for the Department of Homeland Security's Office of Civil Rights and Civil Liberties said recently that COVID-19 presents an "imminent risk to the health and safety" of detainees in ICE detention centers, as well as the general public.[45]

Judges both in the District of Connecticut and around the country are increasingly heeding the call from legal and medical experts by releasing old and vulnerable inmates from overcrowded facilities. On March 20, 2020, Judge Meyer granted an emergency motion for temporary release from Wyatt for a 62-year-old defendant with diabetes awaiting sentencing. *See United States v. Fellela*, No. 3:19-CR-79-JAM, 2020 WL 1457877 (D. Conn. Mar. 20, 2020) (Meyer, J.) In his order, Judge Meyer addressed the conditions of confinement at Wyatt:

> According to an inquiry through the U.S. Marshals Service of the Wyatt facility, there are more than 700 prisoners housed at Wyatt of which more than 500 prisoners are housed in two-person cells and more than 150 prisoners are housed in more-than-two-person cells. There are between 20 to 70 persons at one time in general dayroom areas, and up to 15 persons are allowed in the recreation area at one time. All levels of government nationwide have recently taken drastic measures in light of the COVID-19 pandemic to promote "social distancing" and to prohibit the congregation of large numbers of people with one another. But, as is true for most jails and prisons, the conditions of confinement at Wyatt are not compatible with these safeguards.

---

[43] Letter from Dan Barrett to Justice Andrew McDonald (Mar. 26, 2020), *available at* https://www.acluct.org/sites/default/files/field_documents/2020-03-26_letter_to_committee_requesting_emergency_alteration_of_rules.pdf.

[44] *Id.*

[45] Catherine E. Shoichet, *Doctors Warn of 'Tinderbox Scenario' if Coronavirus Spreads in ICE Detention*, CNN (March 20, 2020, 8:21 PM ET), https://www.cnn.com/2020/03/20/health/doctors-ice-detention-coronavirus/index.html.

*Id.* at *1.  *See also* Ruling and Order Granting Defendant's Motion for Release, *United States v. Forbes*, No. 3:19-CR-64-VLB, ECF No. 1063 (D. Conn. Apr. 6, 2020) (Bryant, J.) (granting motion to reopen bond hearing and ordering release from Wyatt pending trial for 45-year-old defendant with diabetes); Order, *United States v. Hawkins*, No. 3:19-CR-229-AWT, ECF No. 23 (D. Conn. Mar. 19, 2020) (Thompson, J.) (ordering release from Wyatt pending trial for 42-year old defendant with sarcoidosis who allegedly committed offense while on supervised release; release had been denied on February 24, 2020).

B.    <u>Mr. Tyson's medical condition is an extraordinary and compelling reason for a sentence reduction.</u>

Mr. Tyson suffers asthma, sleep apnea, and a nasopharyngeal obstruction that renders him unable to breathe through his nose.  "People with moderate to severe asthma may be at higher risk of getting very sick from COVID-19.  COVID-19 can affect your respiratory tract (nose, throat, lungs), cause an asthma attack, and possibly lead to pneumonia and acute respiratory disease."[46]

The WHO-China Joint Mission Report provided historical mortality rates for those who contracted COVID-19 with specific pre-existing conditions.  For those with cardiovascular disease, the mortality rate was 13.2%.  For those with chronic respiratory disease, the mortality rate was 8.0%.[47]  Many patients with pre-existing conditions who developed severe COVID-19 and did not die, still faced prolonged recovery periods, including extensive rehabilitation from

---

[46] https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/asthma.html

[47] Report of the WHO-China Joint Mission on Coronavirus Disease 2019 (COVID-19), World Health Organization (Feb. 28, 2020), at 12, https://www.who.int/docs/default-source/coronaviruse/who-china-joint-mission-on-covid-19-final-report.pdf (finding fatality rates for patients with COVID-19 and co-morbid conditions to be: "13.2% for those with cardiovascular disease, 9.2% for diabetes, 8.4% for hypertension, 8.0% for chronic respiratory disease, and 7.6% for cancer").

neurologic damage, loss of digits, and loss of respiratory capacity, all of which are likely to render Mr. Tyson unable to independently function within the prison.[48]

The CDC recommends that high-risk people, such as Mr. Tyson, take specific steps to avoid infection.  The recommendations include cleaning your hands often, avoiding close contact with others, and cleaning and disinfecting surfaces regularly.[49]  Brooklyn, MDC where Mr. Tyson is housed, as of April 12, 2020 had four inmates and 12 staff who had tested positive for COVID-19.  Two weeks ago, four Brooklyn, MDC inmates with underlying health issues filed a civil lawsuit against the warden alleging, in part, that the facility was ill-equipped to contain the virus,

> An unnamed MDC prisoner was quoted by his attorney in court records that 'things are very bad here.' . . . 'There are approximately 90 people in a small area, and we are freaking out and are not doing well mentally,' the inmate continued in the court filing. '[W]e cannot get any information or anyone to listen to us. ... Please help me before I die.'
> There are approximately 1,700 inmates at MDC, and, according to the lawsuit, 537 of them are classified by BOP as vulnerable to COVID-19 using CDC guidelines, based on their age and existing health conditions.
>
> Attorneys for the four prisoners have asked a federal judge to release them immediately because the typical processes for seeking compassionate release from BOP have been mired in delays.
>
> The threat to the inmates' lives 'is ongoing, not simply imminent,' the lawsuit states. 'Every hour that [they] are held in the MDC, they are at a significantly elevated risk of contracting coronavirus, and because of their age and/or medical conditions, their risk of dying from coronavirus is significant.'

https://abcnews.go.com/Health/covid-19-tests-prisoners-center-york-outbreak-court/story?id=69969077

Given that he was slated for release on April 1, further confinement of Mr. Tyson in the COVID-19 incubator that is Brooklyn, MDC, is dangerous and totally unnecessary.

---

[48] *Id.*
[49] CDC, How to Protect Yourself, available at https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/prevention.html?CDC_AA_refVal=https%3A%2F%2Fwww.cdc.gov%2Fcoronavirus%2F2019-ncov%2Fprepare%2Fprevention.html

**IV.     A sentence of time served is sufficient to accomplish the goals of sentencing.**

When extraordinary and compelling reasons are established, the Court must consider the relevant sentencing factors in § 3553(a) to determine whether a sentence reduction is warranted. 18 U.S.C. § 3582(c)(1)(A)(i).   Under all of the circumstances in this case, the Court should conclude that the time that Mr. Tyson has already served is sufficient to satisfy the purposes of sentencing.   Under *Pepper v. United States*, 562 U.S. 476, 492 (2011), the Court can, and indeed must, consider "the most up-to-date picture" of the defendant's history and characteristics, which "sheds light on the likelihood that [the defendant] will engage in future criminal conduct."

Here, the overriding factor under § 3553(a) that was not present at the time of sentencing is the COVID-19 pandemic and the serious risk it presents.   Although the circumstances of the present offense qualified Mr. Tyson for the serious sentence that this Court originally imposed, the sentencing purpose of just punishment does not warrant a sentence that includes exposure to a life-threatening illness.   In fact, the Eighth Amendment's prohibition on cruel and unusual punishment includes unreasonable exposure to dangerous conditions in custody.   *Helling v. McKinney*, 509 U.S. 25, 28 (1993); *see also Wallis v. Baldwin*, 70 F.3d 1074 (9th Cir. 1995) (applying *Helling* to exposure to asbestos); *Brown v. Mitchell*, 327 F. Supp.2d 615, 650 (E.D. Va. July 28, 2004) (applying *Helling* to "contagious diseases caused by overcrowding conditions").   The § 3553(a) factors can be met in this case by an order of 151-180 days of home confinement as a condition of supervised release.

The Eighth Amendment also guarantees inmates in BOP custody the right to adequate medical care for a serious medical need.   *See Farmer v. Brennan*, 51 U.S. 825, 832 (1994); *Estelle v. Gamble*, 429 U.S. 97, 103–05 (1976).   One court recently invoked the Eighth Amendment in granting a motion for compassionate release, noting that "a reduction of [defendant's] sentence

will enable him to seek, from the doctors and hospitals of his choice, what may be better medical care than the BOP is obligated or able to provide, particularly given the very real threat that COVID-19 poses in the institutional environment." Order, *United States v. Williams*, No. 3:04-CR-95-MCR-CJK, ECF No. 91 (N.D. Fla. Apr. 1, 2020).

Mr. Tyson's offense was serious and the sentence, five years, certainly reflected that. However, at this juncture, Mr. Tyson has completed the custodial portion of the RDAP program and, because of that, he is now eligible for release to a half-way house. There appears to be no explanation for BOP's failure to release him other than the COVID-19 pandemic. The relief that Mr. Tyson now seeks – release to his mother's home for five to six months of home confinement - is not unreasonable, he has earned it through his hard work in the RDAP program and it is relief that is critical to his health.

Additionally, Mr. Tyson's conduct while in prison establishes that the purposes of punishment have been met. Under *Pepper*, the Court must also consider "the most up-to-date picture" of the defendant's history and characteristics, which "sheds light on the likelihood that [the defendant] will engage in future criminal conduct." *Id.* at 492. Mr. Tyson has received no disciplinary tickets while incarcerated, he completed RDAP and earned his GED. *Exhibit E.* He completed phase one of the National Parent Program, the three day release orientation program, programs in auto technology, computer skills, beadery, greeting cards, writing for success, welding, GED class, and "Failing Forward". *Id.*

He has shown by his conduct that he no longer poses a threat to public safety, and that granting him compassionate release would not endanger the community. The totality of the circumstances demonstrates that reducing Mr. Tyson's sentence to time served – particularly when

he was scheduled for release earlier this month based on completion of RDAP, is "sufficient, but not greater than necessary," to serve the purposes of sentencing under § 3553(a).

Mr. Tyson has a release plan to ensure his safe transition to the community. Mr. Tyson would live with his mother, Ceya Tyson, in Hartford, with whom he lived prior to serving his sentence. He abided by the conditions of release prior to sentencing and he self-surrendered to serve his sentence without issue.

## V.    The Court can and should waive the 30-day requirement for exhaustion of administrative remedies under 18 U.S.C. § 3582(c)(1)(A).

The 30-day waiting period is not a jurisdictional bar to considering a compassionate-release claim. Rather, it is a claim-processing rule and like any claim-processing rule, there are certain recognized exceptions that must apply in some cases. Mr. Tyson only has to show that one of them applies to excuse the exhaustion requirement. Yet here, all three (futility, inability to grant relief, and undue prejudice) independently and collectively justify waiving the 30-day requirement.

### A.    The exhaustion requirement is non-jurisdictional and subject to exception.

There are two types of exhaustion requirements: one is jurisdictional; the other is a claim-processing rule. *See Bowles v. Russel*, 551 U.S. 205, 211-12 (2007) (noting "the jurisdictional distinction between court-promulgated rules and limits enacted by Congress"); *Fort Bend Cty., Texas v. Davi*s, 139 S. Ct. 1843, 1849 (2019) ("The Court has therefore stressed the distinction between jurisdictional prescriptions and non-jurisdictional claim-processing rules, which seek to promote the orderly progress of litigation by requiring that the parties take certain procedural steps at certain specified times."). Jurisdictional preconditions cannot be waived or excused, but claim-processing rules can be. *Gonzalez v. Thaler*, 565 U.S. 134, 142 (2012) ("[s]ubject matter jurisdiction can never be waived or forfeited"); *see Hamer v. Neighborhood Hous. Servs. of Chicago*, 138 S. Ct. 13, 17 (2017) ("Mandatory claim-processing rules are less

stern.").  And over the last decade, "the Supreme Court has taken new care to distinguish between truly (i.e., non-waivable) jurisdictional rules and ordinary case-processing rules." *United States v. Taylor*, 778 F.3d 667 (7th Cir. 2015).

"Even where exhaustion is seemingly mandated by statute . . . , the requirement is not absolute." *Washington v. Barr*, 925 F.3d 109, 118 (2d Cir. 2019) (Calabresi, J.)  The Supreme Court has "made plain that most time bars are nonjurisdictional," and recently stated that "even when the time limit is important (most are) and even when it is framed in mandatory terms (again, most are); indeed, however emphatically expressed those terms may be[,] Congress must do something special, beyond setting an exceptions-free deadline, to tag a statute of limitations as jurisdictional and so prohibit a court from tolling it." *United States v. Kwai Fun Wong*, 575 U.S. 402, 410 (2015) (Kagan, J.)

> B.    All three exceptions to the exhaustion requirement apply here.

Since § 3582(c)(1)(A)'s exhaustion demand is a non-jurisdictional claim-processing rule, it is subject to certain exceptions.  There are three circumstances where failure to exhaust may be excused.  "First, exhaustion may be unnecessary where it would be futile, either because agency decisionmakers are biased or because the agency has already determined the issue." *United States v. McCarthy*, Nos. 3:17-CR-230 (JCH), 3:92-CR-70 (JCH), 2020 WL 1698732, *3 (D. Conn. Apr. 8, 2020) (quoting *Washington*, 925 F.3d at 118).  Second, "exhaustion may be unnecessary where the administrative process would be incapable of granting adequate relief." *Id.*  Third, "exhaustion may be unnecessary where pursuing agency review would subject plaintiffs to undue prejudice." *Id.*

All three of these exceptions apply here.  "[U]ndue delay, if it in fact results in catastrophic health consequences, could make exhaustion futile.  Moreover, the relief the agency might provide

could, because of undue delay, become inadequate.  Finally, and obviously, Mr. Tyson could be unduly prejudiced by such delay." *United States v. Perez*, __ F. Supp. 3d __, 2020 WL 1546422, *4 (S.D.N.Y. Apr. 1, 2020) (Torres, J.) (citing *Washington*, 925 F.3d at 120–21); *see also Bowen v. City of New York*, 476 U.S. 467, 483 (1986) (holding that irreparable injury justifying the waiver of exhaustion requirements exists where "the ordeal of having to go through the administrative process may trigger a severe medical setback" (internal quotation marks, citation, and alterations omitted)); *Abbey v. Sullivan*, 978 F.2d 37, 46 (2d Cir. 1992) ("[I]f the delay attending exhaustion would subject claimants to deteriorating health, . . . then waiver may be appropriate."); *New York v. Sullivan*, 906 F.2d 910, 918 (2d Cir. 1990) (holding that waiver was appropriate where "enforcement of the exhaustion requirement would cause the claimants irreparable injury" by risking "deteriorating health, and possibly even . . . death").

The futility and potentially irreparable harm of requiring Mr. Tyson to wait a minimum of 30 days to exhaust his administrative remedies are manifest.  Mr. Tyson seeks this emergency relief to avoid contracting COVID-19 at a federal prison where he has a high risk of infection: "social distancing" is impossible in the crowded facility, and soap, hand sanitizer and disinfectant products are scarce.  Waiting for Mr. Tyson to exhaust his administrative remedies would only compound his risk of exposure to COVID-19.  Should he contract the virus while waiting for an administrative response, any remedy will come too late—Mr. Tyson will be in danger, causing him potentially irreparable physical harm, and rendering this compassionate release request moot. *See, e.g.*, *Sorbello v. Laird*, No. 06 CV 948 (JG), 2007 WL 675798, *3 n.8 (E.D.N.Y. Feb. 28, 2007) (Gleeson, J.) (refusing to dismiss petition requesting designation to halfway house "for failure to exhaust administrative remedies" where delay in processing administrative remedies would "result in the irreparable harm of late designation to community confinement"); *Pimentel v.*

*Gonzales*, 367 F. Supp.2d 365, 371 (E.D.N.Y. 2005) (Garaufis, J.) (addressing merits of request for designation to halfway house, where "not only would an administrative appeal be futile, but without immediate relief by this court, Pimentel could suffer irreparable harm," as "[w]ere Pimentel required to pursue administrative remedies prior to bringing this action, he would likely be done serving much, if not all of his entire sentence such that his request would become moot.").[50]   In these extraordinary circumstances, the Court should waive the administrative exhaustion requirement in § 3582.

In the last few days, several courts in the District of Connecticut have excused the exhaustion requirement in COVID-related compassionate release cases. *See, e.g.*, *United States v. McCarthy*, Nos. 3:17-CR-0230 (JCH), 3:92-CR-0070 (JCH), 2020 WL 1698732, *4 (D. Conn. Apr. 8, 2020) (Hall, J.) ("[I]n light of the urgency of McCarthy's request, the likelihood that he cannot exhaust his administrative appeals during his remaining 26 days of imprisonment, and the potential for serious health consequences, the court waives the exhaustion requirement of section 3582(C)(1)(A)."); *United States v. Colvin*, No. 3:19-CR-179 (JBA), 2020 WL 1613943, *2 (D. Conn. Apr. 2, 2020) (Arterton, J.) ("[I]f Defendant contracts COVID-19 before her appeals are exhausted, the undue delay might cause her to endure precisely the 'catastrophic health consequences' she now seeks to avoid. *See* CDC Guidance. . . . Third, Defendant would be subjected to undue prejudice—the heightened risk of severe illness—while attempting to exhaust her appeals.  Thus, in light of the urgency of Defendant's request . . . and the potential for serious

---

[50] The factual questions at issue—the rapid spread of COVID-19, the serious danger to certain high-risk individuals, and Mr. Tyson's health conditions placing him squarely in the highest fatal risk group—are well-developed in the record before this Court, thus rendering administrative exhaustion all but pointless. *See Gurzi v. Marquez*, No. 18-CV-3104-NEB-KMM, 2019 WL 6481212, *2 (D. Minn. Oct. 10, 2019) ("given the clear circumstances here, a principal purpose of administrative exhaustion, the development and crystallization of the factual record, is not implicated in this case." (quotation marks and citations omitted)).

health consequences, the Court waives the exhaustion requirement of Section 3582(c)(1)(A)."); *United States v. Jepsen*, No. 3:19-CV-73 (VLB), 2020 WL 1640232, *3 (D. Conn. Apr. 1, 2020) (Bryant, J.) (exhaustion requirement satisfied where prisoner designated to Wyatt "is essentially caught in a 'Catch-22'" where "neither the warden at Wyatt nor the BOP will consider his request because of his designation to Wyatt, a non-BOP facility").[51]

Numerous courts within the Second Circuit and around the country are in accord. *See, e.g.*, *United States v. Jemal*, Crim. Action No. 15-570, 2020 WL 1701706, *3 (E.D. Pa. Apr. 8, 2020) (where defendant sent compassionate relief request to the warden "ten days ago," resolving to "wait four more days" to "give the BOP an additional opportunity to act," and noting that "we are not convinced . . . that we must rigidly adhere to the statutory directive that the BOP be provided up to thirty days to address Defendant's compassionate release request, without considering a futility exception to exhaustion"); *United States v. Zukerman*, No. 16 Cr. 194 (AT), 2020 WL 1659880, *2–*3 (S.D.N.Y. Apr. 3, 2020) (Torres, J.) ("[T]he Court holds that Zukerman's exhaustion of the administrative process can be waived in light of the extraordinary threat posed— in his unique circumstances—by the COVID-19 pandemic. . . . [R]equiring him to exhaust administrative remedies, given his unique circumstances and the exigency of a rapidly advancing pandemic, would result in undue prejudice and render exhaustion of the full BOP administrative process both futile and inadequate."); *United States v. Resnick*, No. 14 CR 810 (CM), 2020 WL

---

[51] *But see United States v. Gagne*, No. 3:18-CR-242 (VLB), 2020 WL 1640152, *4 (D. Conn. Apr. 2, 2020) (Bryant, J.) ("Defendant does not present the 'unique circumstances' warranting excusal of the exhaustion requirement considered by the Southern District of New York in *United States v. Perez*, 17-cr-513-3, at 2 (S.D.N.Y. Apr. 1, 2020) [Dkt. 74, Ex. 4]."); *United States v. Gileno*, No. 3:19-CR-161 (VAB), 2020 WL 1307108, *3 (D. Conn. Mar. 19, 2020) (Bolden, J.) ("As a threshold matter, Mr. Gileno has not satisfied the requirement under 18 U.S.C. § 3582(c)(1)(A) to first request that the Bureau of Prisons file a motion on his behalf and then show that thirty days have passed without any BOP action. As a result, the Court cannot consider his motion to modify his sentence."). Significantly, the issue was not fully briefed in *Gileno*, and the defendant in that case did not appear to have severe medical issues that constituted pre-existing conditions for purposes of COVID-19.

1651508, *5–*6 (S.D.N.Y. Apr. 2, 2020) (McMahon, J.) (where Defendant's request for compassionate release was "not stamped received by the warden until March 16, 2020," and Government argued that Defendant's motion should be denied for failure to exhaust administrative remedies, "[t]he Government is wrong"); *United States v. Perez*, __ F. Supp. 3d __, 2020 WL 1546422, *3 (S.D.N.Y. Apr. 1, 2020) (Torres, J.) ("Here, even a few weeks' delay carries the risk of catastrophic health consequences for Perez. The Court concludes that requiring him to exhaust administrative remedies, given his unique circumstances and the exigency of a rapidly advancing pandemic, would result in undue prejudice and render exhaustion of the full BOP administrative process both futile and inadequate."); *United States v. Rodriguez*, No. 2:03-CR-271-AB, 2020 WL 1627331, *2 (E.D. Pa. Apr. 1, 2020) (Brody, J.) (in granting compassionate release, holding that Court can waive exhaustion requirements and can "independently assess" whether extraordinary and compelling reasons exist to grant the defendant a sentence reduction, rather than relying on an assessment from the Director of the Bureau of Prisons); *United States v. Gonzalez*, No. 2:18-CR-232-TOR, 2020 WL 1536155, *1 (E.D. Wash. Mar. 31, 2020) ("The Court finds that Defendant has effectively exhausted her administrative remedies by petitioning the BOP, giving them notice, and being told she does not have any other administrative path or remedies she can pursue. Any further attempt to exhaust administrative remedies at this time would be futile."); Order, *United States v. Marin*, No. 1:15-CR-252-PKC-RML, ECF No. 1326 (E.D.N.Y. Mar. 30, 2020) (Chen, J.) ("Although Defendant has not exhausted his administrative remedies in the manner prescribed by Section 3582(c), because the government is consenting to the requested sentencing reduction, the Court deems Section 3582(c)'s exhaustion requirement as having been met."); Amended Order, *United States v. Powell*, No. 1:94-CR-316-ESH, ECF No. 98 (D.D.C. Mar. 28, 2020) (in granting compassionate release, holding that it "would be futile" to

39

require defendant to first exhaust in light of open misdemeanor case).[52]; *see also* Joint Submission Regarding Defendant Ghorbani's Motion for Reduction of Sentence Pursuant to Compassionate Release, *United States v. Ghorbani*, No. 1:18-CR-255-PLF, ECF No. 129 (D.D.C. Apr. 3, 2020) (in joint proposal for compassionate release, government concedes that "a Court can dispense with the administrative exhaustion requirement" in 18 U.S.C. § 3582(c)(1)(A)(i)); Letter from U.S. Attorney to Judge Claire C. Cecchi, *United States v. Gentry*, No. 2:19-CR-78-CCC, ECF No. 98 (D.D.C. Apr. 5, 2020) (in requesting compassionate release, government concedes that 30-day waiting requirement "doesn't apply here").

Finally, even if exhaustion is required, the Bureau of Prisons has publicly stated that, pursuant to a March 26, 2020, memorandum from Attorney General William Barr, "all inmates are being reviewed for suitability" for compassionate release.[53]  Because the Bureau of Prisons has begun the compassionate release review process for "all inmates" as of March 26 and has, moreover, publicly indicated that the filing of a specific request is not necessary, the 30-day time for BOP review should be construed as elapsing no later than April 25, 2020.

---

[52] *But see United States v. Raia*, No. 20-1033, 2020 WL 1647922, *2 (3d Cir. Apr. 2, 2020) (where defendant filed compassionate release motion with appeals court in the first instance, declining to remand for failure to exhaust administrative remedies).  *Raia*, however, did "not directly address the question of whether, under certain circumstances, futility [or other exceptions] can excuse a defendant's failure to exhaust administrative remedies under 3582(c)(1)(A)."  *See United States v. Jemal*, Crim. Action No. 15-570, 2020 WL 1701706 (E.D. Pa. Apr. 8, 2020) ("[W]e are not convinced . . . that we must rigidly adhere to the statutory directive that the BOP be provided up to thirty days to address Defendant's compassionate release request, without considering a futility exception to exhaustion.").

[53] https://www.bop.gov/resources/news/20200405_covid19_home_confinement.jsp

## VI.  Conclusion

COVID-19 has triggered a pandemic. The virus is highly transmissible, extraordinarily dangerous, and poses a severe threat of death to older individuals and those with underlying illnesses. Given Mr. Tyson's respiratory issues, he is exceptionally vulnerable to contracting the deadly disease, which constitutes "extraordinary and compelling reasons" to grant his motion for compassionate release.

For the foregoing reasons, Mr. Tyson respectfully requests that the Court grant a reduction in his sentence to time served, with 151 to 180 days of home confinement as a condition of supervised release.

Respectfully Submitted,

THE DEFENDANT,

Marcus Tyson

FEDERAL DEFENDER OFFICE

/s/ Moira L. Buckley
Assistant Federal Defender
10 Columbus Boulevard, Fl. 6
Hartford, CT 06106
Phone: (860) 493-6260
Bar No.: CT18803
Email: Moira_Buckley@fd.org

CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on April 16, 2020, a copy of the foregoing was filed electronically and served by mail on anyone unable to accept electronic filing. Notice of this filing will be sent to wall parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing. Parties may access this filing through the Court's CM/ECF System.

/s/ Moira L. Buckley
Moira L. Buckley